## BULLARD BROTHERS *v.* BANK OF MADISON.

A promise by the cashier of a bank, made without consideration to the drawer of a draft, to pay the same out of funds of a customer on whom the draft is drawn and who has been credited with the proceeds of negotiable paper which he as owner transferred to the bank, is not enforceable against the bank, unless the customer assents that the bank shall make such an application of the funds so placed to his credit.

The court fully and fairly covered by its charge every issue raised by the pleadings which the plaintiff had a right to have the jury pass upon; and the verdict in favor of the defendant was warranted, if not demanded, by the evidence.

Argued November 25, — Decided December 21, 1904.

Equitable petition. Before Judge Lewis. Morgan superior court. March 30, 1904.

*F. Jordan & Son, W. B. Wingfield,* and *Q. L. Williford,* for plaintiffs. Action for money had and received: 2 Enc. Pl. & Pr. 1016 et seq.; 2 Gr. Ev. 98 et seq.; 2 Story's Eq. 1255–6; 4 L. R. A. 491; *Ga. R.* 7/64; 12/422; 89/799. Authority of cashier to bind the bank by his promise to pay the drafts: 17 Am. & Eng. Enc. L. (1st ed.) 139; 48 L. R. A. 212; 10 Wall. 644; 96 U. S. 630; 29 N. J. Eq. 98; 1 Morse, Bkg. § 166; 15 Wall. 165; Perry, Tr. 222. Ultra vires: 2 Beach, Priv. Corp. §§ 422–424; 2 Morse, Bkg. § 750; 96 U. S. 30. Appropriation of payments: 1 Pet. 264, 289; *Ga. R.* 30/857; 57/198; 70/53; 71/18, 677; 73/739; 76/328; 79/130, 174; 84/227. Deposit of bills of lading, trust fund: 1 Perry, Tr. 217, 221, 248; 3 L. R. A. 801; 6 Ib. 191; 18 Ib. 204; 30 Ib. 290; 32 Ib. 298, 300, 306, 373; 39 Ib. 84; Civil Code, §§ 3159–61; *Ga. R.* 1/418; 8/245. Privity of contract: Clark, Con. 766; *Ga. R.* 7/191; 98/22; 107/217; 113/528. Statute of frauds: Civil Code, § 3657; *Ga. R.* 80/698; 84/227; 87/474; 106/424; 110/117.

*Foster & Butler,* for defendant. Bank not bound by alleged promise of cashier: Civil Code, § 2693, par. 2; Fed. Case 9,857; 57 N. Y. 126; 3 Gill, 96; 10 Curtis, 20; 21 How. (U. S.) 356;

8 Wheat. 360; 47 Vt. 546; 82 Fed. 799; 72 S. W. 1059; 61 N. H. 589; 66 Fed. 691; 77 Fed. 129; 56 Fed. 959; 14 Mass. 58; 17 Mass. 29 (9 Am. Dec. 111); 1 Pet. 46–72; 7 Curtis, 454; 14 Miss. 218; 1 Coldw. (Tenn.) 156; 21 Am. & Eng. Enc. L. 852, 855.

EVANS, J. During the cotton season of 1896, Bullard Brothers, a firm doing business at Machen, Ga., engaged in buying cotton on commission. Under an arrangement made with J. D. Tweedy, a cotton buyer of Madison, Ga., Bullard Brothers shipped cotton to him, receiving a commission of twenty-five cents per bale. It was customary for that firm to pay for cotton purchased by it with a draft drawn on Tweedy in favor of the seller, and for Tweedy to honor the draft as soon as he received the cotton or a bill of lading therefor. At the beginning of the season, Bullard Brothers took out bills of lading in the name of the firm as consignor, but later adopted the course of having them made out in the name of Tweedy as consignor, as well as consignee. On receiving a bill of lading covering a particular shipment, Tweedy would go to the Bank of Madison and indorse and surrender to it the bill of lading, afterwards substituting therefor another bill of lading covering a shipment of cotton to one of his customers, which the bank would attach to a draft drawn on such customer for the amount of the purchase-price he had agreed to pay. In this way the Bank of Madison, which made advances to Tweedy on the security of the bills of lading indorsed to it, placed itself in a position where it could pay for Tweedy drafts drawn on him by Bullard Brothers and other parties making sales to him. Near the close of the cotton season, Tweedy became involved; the bank declined to make further advances to him; and a number of drafts which had been drawn on him by Bullard Brothers, and which the holders had sent to the bank for collection, were either protested for non-payment or returned by the bank with the statement that the same could not be collected. Subsequently Bullard Brothers were compelled to settle with the holders of these drafts. The purpose of this suit was to require the bank to refund to Bullard Brothers the amount so expended. As showing the liability of the bank, the following allegations were made in the plaintiffs' petition: The drafts were received

by the bank for collection and were by it presented to Tweedy for payment, who drew and delivered to the bank his check on it for the aggregate amount called for by these drafts. At the time Tweedy had on deposit in the bank a sufficient sum of money to cover his check, and it was accepted by the bank in payment of the drafts. The bank subsequently honored numerous other checks drawn on it by Tweedy; had in its possession the bills of lading covering the cotton in payment of which the drafts were given, having demanded these bills of lading from Tweedy when he gave his check in payment of the drafts; and subsequently, by virtue of Tweedy's transfer to the bank of these bills of lading, came into possession of the cotton and received the proceeds thereof on a resale to one of his customers, well knowing that the cotton had not been paid for and that the aforesaid drafts had been drawn against it.

At the trial of the case the plaintiffs offered an amendment to the petition, which the court allowed over the objection of the defendant. In this amendment the following additional allegations were made: The change in the mode of shipping cotton to Tweedy, whereby bills of lading were taken out in his name as consignor instead of in the name of Bullard Brothers, was made at the instance of the bank and upon the faith of its statement that it "was paying for Tweedy's cotton" and could not protect Bullard Brothers unless the cotton was shipped as directed, but could and would protect that firm provided its shipping directions were complied with. Bullard Brothers relied on this promise and undertaking on the part of the bank and shipped cotton to Tweedy accordingly, looking to the bank to protect the firm in its cotton dealings with Tweedy. In view of this promise and undertaking, the cotton shipped to Tweedy "was quasi-trust cotton," and the bank was under legal obligation to pay drafts drawn on him for the purchase-price thereof, and could not appropriate the cotton or the proceeds thereof to other indebtedness of Tweedy. The legal effect of the bank's undertaking was "to make it, as far as petitioner's cotton was concerned, Tweedy's paymaster or trustee," and the bank was "in good conscience and law obliged to appropriate the money arising from the sale of cotton shipped said Tweedy by" Bullard Brothers to drafts which that firm drew on him for the purchase-price, and could not,

34

"without a breach of trust, appropriate it to extrinsic debts due it by said Tweedy." On December 11, 1896, S. H. Bullard, a member of the firm, "came to the City of Madison for the purpose of collecting on bills of lading for something like sixty-one hundred dollars worth of cotton which had been purchased by petitioner and shipped to J. D. Tweedy; . . said bills of lading were delivered to H. T. Shaw, cashier of the Bank of Madison, who paid to petitioner thereon the sum of fifty-five hundred dollars and inquired of S. H. Bullard whether or not said payment was in full for all cotton represented by said bills of lading. . . S. H. Bullock replied in the negative, stating to said Shaw that there was outstanding against said cotton small drafts amounting to about $125.00 and for what was known as the Deiter cotton," so that there were then outstanding drafts for something over $200.00. S. H. Bullard further stated that the draft representing the purchase-price of the Deiter cotton "was to be sent to a gentleman in New York, and would not be presented for payment until it could be transmitted to New York and from there back to Madison;" and Shaw then "accepted said bill of lading and said it would be all right, that when said draft was presented it would be paid." This draft, which was drawn in favor of one Huntington, was one of those which Bullard Brothers had to pay, as stated in the original petition. During the course of the same conversation, Shaw asked Bullard how much more cotton his firm expected to buy for Tweedy, and Bullard replied, "between seventy-five and one hundred bales, as this was about all there was left at and around Machen." Bullard also mentioned the names of certain parties from whom his firm expected to buy some fifty bales, and told Shaw that the members of his firm "would not come again to Madison to collect on their bills of lading, but would draw on J. D. Tweedy for" the cotton as it was purchased. "Shaw said that was all right. He did not say that he would not pay the drafts as he had been doing; on the contrary he said, in addition to 'that was all right,' that J. D. Tweedy was getting along nicely; that he, Shaw, had succeeded in keeping him from speculating, and he was making money." For the price of the cotton subsequently purchased and shipped to Tweedy, the drafts referred to in the original petition as having been drawn on Tweedy after December 11th and as having been

returned to the holders with notice of dishonor were given by Bullard Brothers to the parties from whom the cotton was bought and with whom that firm was thereafter forced to settle. By another amendment to the petition the plaintiffs alleged that "Shaw was cashier of the Bank of Madison and acting within the scope of his authority as such cashier, and had authority to make the statements and enter into the transactions" above set forth.

A trial was had on the merits, the defendant bank having by its answer denied all liability to respond to the plaintiffs. In view of the evidence submitted pro and con, the court declined to leave to the determination of the jury any issue save as to the liability of the defendant with respect to its dishonor of the Huntington draft, drawn on Tweedy by Bullard Brothers in payment of the Deiter cotton, which the plaintiffs claimed the bank had, on December 11, expressly agreed to pay on presentation. The jury decided this issue in favor of the bank. The plaintiffs made a motion for a new trial, therein complaining of the refusal of the court to submit other issues to the jury, and assigning error upon certain portions of the charge of the court. The motion for a new trial was overruled, and the plaintiffs excepted. A cross-bill of exceptions, in which complaint was made of the allowance of the first amendment to the petition, was thereupon sued out by the defendant bank, which also therein assigned error on the overruling of a demurrer it had made to the petition as amended. As we have reached the conclusion that the judgment denying the motion for a new trial should be affirmed, it is unnecessary to further deal with the cross-bill of exceptions. The record before us discloses the following facts: The president of the bank informed one, if not both, of the members of the firm of Bullard Brothers that the only way in which that firm could protect itself in its dealings with Tweedy was to follow the usual custom of attaching to drafts drawn on him the bills of lading representing the cotton shipped to him. The reply received was to the effect that Bullard Brothers could not adopt this course, as it was necessary for Tweedy to control the cotton and resell it to his customers before actual payment, by substituting for the bills of lading sent to him by Bullard Brothers other bills of lading which he could attach to drafts drawn on such customers. At the beginning of the season, Bullard Brothers took out bills of lading in the

name of the firm as consignor, and sent them direct to Tweedy. The bank declined to advance Tweedy on these bills of lading until he procured the indorsement of Bullard Brothers thereon, indicating that firm's assent to his transfer of the same, and delay was occasioned by the necessity of returning the bills of lading to Bullard Brothers for indorsement. Both Tweedy and the bank urged Bullard Brothers to avoid this delay by having the bills of lading issued in the name of Tweedy as consignor, as well as consignee. The bank did assure Bullard Brothers that if this plan was pursued the bank would be in a better position to protect the interests of the firm, because it could make advances to Tweedy at once on the bills of lading sent to him, and he would thus be enabled to pay the drafts drawn on him for the cotton as they were presented. But the bank entered into no agreement with Bullard Brothers, with or without consideration, whereby the bank was to guarantee the payment of drafts drawn by the firm on Tweedy to pay for cotton shipped to him. Nor was the cotton so shipped in any sense "quasi-trust cotton." On the contrary, Bullard Brothers sold to Tweedy on credit, contemplating that he should deal with the bills of lading as his own and transfer the same to the bank, and trusting to him to raise funds with which to meet the drafts drawn on him. In other words, the bank had the right, under the circumstances, to treat Tweedy as the owner of the cotton, to accept it as security for advances made to him, and to make payment out of the funds deposited to his credit in such manner as and to whomsoever he might direct, irrespective of the source from which such funds were realized. This being the real truth of the matter, as conclusively shown by the evidence, the court certainly did not err in refusing to submit to the jury any of the plaintiffs' contentions to the contrary, raised by the pleadings. The court also properly declined to call on the jury to determine whether or not, at the time the dishonored drafts were presented to Tweedy for payment, he had on deposit sufficient funds to meet the same and the bank accepted his check in payment of these drafts. The evidence discloses that the allegations in the plaintiffs' petition in this regard had no foundation in fact.

As to whether or not the cashier of the defendant bank really agreed to pay the Huntington draft on presentation, the evidence

was conflicting. But however this may be, it does not appear that at the time the promise was alleged to have been made, Bullard Brothers had any ownership of or control over the bills of lading representing the cotton for which that draft was given. The only conclusion warranted by the testimony is that these bills of lading had been surrendered to and belonged to Tweedy at the time the bank advanced money thereon, and that the advance was made to him and not to Bullard Brothers. There was no evidence that he assented to or contemplated payment of the draft out of the proceeds of these particular bills of lading. The court, however, charged the jury, in effect, that if they believed such an arrangement was made by Bullard with the cashier of the bank, and that Tweedy assented thereto, the bank would be liable for the amount of the Huntington draft, if it was returned to the holder with notice of dishonor; but if the understanding between Tweedy and Bullard was that out of the proceeds of the $6,100 worth of bills of lading the bank should pay Bullard only the amount of $5,500 received by him, then the difference would belong to Tweedy, and the bank was bound to credit his account with that amount and to apply it to any purpose Tweedy might thereafter direct. This charge was certainly as favorable to the plaintiffs as the plaintiffs had any right to demand or expect. The plaintiffs failed to sustain the theory on which the petition was evidently based, viz., that the bills of lading belonged to Bullard Brothers and were surrendered to the bank on condition that the Huntington and other outstanding drafts would be paid on presentation out of the proceeds. Unless Bullard Brothers owned or controlled the bills of lading, or (if they belonged to Tweedy) he assented to the payment by the bank of the outstanding drafts, the alleged promise of its cashier to pay them on presentation was wholly without consideration and in no sense binding on the bank, on the doctrine of estoppel or upon any other theory of liability. The plaintiffs' evidence was at fault, not the charge of the court.

*Judgment on main bill of exceptions affirmed; cross-bill of exceptions dismissed. All the Justices concur.*