## FIRST NATIONAL BANK OF TALLAPOOSA *et al. v.* MONROE *et al.*

1. A national bank, in negotiating its paper, can bind itself for the payment thereof by its indorsement thereon; but it can not guarantee the payment of the paper of others, or become surety thereon, solely for the benefit of the latter.
2. A national bank loaned to one of its customers, a private corporation, an amount greater than ten per cent, of its unimpaired capital stock and surplus, in violation of the provisions of the Federal statute. The cashier of the bank, who was secretary and treasurer of the bank's debtor, notified another of this fact, and stated to him that the "only way the bank could extend any further credit" to its debtor "was by procuring a loan" from him "to be secured by said bank," and induced such other person to lend the bank's debtor $15,000, upon the guaranty of the cashier individually, and of the bank through its cashier, of the payment of the notes of the bank's debtor for the amount borrowed. *Held:* (*a*) A national bank can not ratify such an ultra vires act. (*b*) The fact that the cashier's object in making statements to the lender to induce him to make the loan "was to procure to said bank the payment to it of the said amount so due said bank" by its debtor and to release the cashier from his liability "in making said excessive loan," and the fact that the bank received $11,640.02 of the $15,000 borrowed, do not estop it from setting up the invalidity of such guaranty on its part.

JANUARY 11, 1911.

Equitable petition. Before Judge Edwards. Haralson superior court. December 13, 1909.

*G. R. Hutchens* and *Dorsey, Brewster, Howell & Heyman,* for plaintiffs in error.

*Lloyd Thomas, Griffith & Matthews,* and *King & Spalding,* contra.

HOLDEN, J. ·The defendants in error, hereinafter called the plaintiffs, in a suit to recover upon the guaranty hereinafter referred to, and for other purposes, made substantially the following allegations: The First National Bank of Tallapoosa, one of the plaintiffs in error, through its cashier, had loaned one of its customers, the Southern Car Wheel Iron Company (a private corporation) an amount in excess of the amount permitted by law to be loaned to one person, and the debtor was unable to make any payment thereon. The cashier of the bank stated to the plaintiffs, who had in the bank the "sum of $20,000 on a deposit of twelve months," that the bank would "readily let said Iron Company have whatever money it needed, but for the fact that the bank had already loaned said Iron Company more money than was authorized by its charter, and the only way it could extend any further credit to said Iron Company was by procuring a loan from petitioners to be secured by said bank;" and that if the loan was made, he and the bank would guarantee the payment thereof; "that the entire management of the bank was left with him; that he had frequently made such guarantees for the bank; and that he had full authority to make such guaranty." On or about May 3, 1907, the cashier stated, that he had become the secretary and treasurer of the Iron Company, that he was then in position to make the loan for the plaintiffs of $15,000, and that if the loan was made, "the same would be sufficient to pay off all the urgent and pressing debts and would afford said Southern Car Wheel Iron Company a sufficient working capital for one month's run in advance." The statement as to the amount of urgent and pressing debts was false, and known by the cashier to be false when made. Such debts amounted to $50,000. The plaintiffs relied upon such statements as true. "Statements of the said cashier that he was allowed by the officers and directors of said bank to have the entire control and management of said bank was true." The cashier's object, in making statements to the plaintiffs to induce them to make the loan, "was to procure to said bank the payment to it of the said amount so due said bank by said Southern Car Wheel Iron Company, and to release Rowe Price from his liability as cashier in making said excessive loan." Upon the statements of the cashier, and relying upon the guaranty as a valid and sufficient security, the plaintiffs, on May 14, 1907, made the loan of $15,000 to the Iron Company, and took the latter's several notes therefor and the guar-

anty of the cashier and the bank of the payment of the notes. The notes were placed for collection with said bank, which reported four of the notes paid as they matured. The other seven notes are unpaid, and the Iron Company "is hopelessly insolvent and is now in bankruptcy." The bank and cashier are indebted to the plaintiffs $13,000 principal, besides interest and attorney's fees, on the guaranty, which, as appears from a copy of it set out in the petition, was signed by Rowe Price individually, and by the bank "by Rowe Price, Cashier." $11,640.02 of the $15,000 loaned was applied to the payment of debts due the bank by the Iron Company. The petition also alleged a sale by the national bank of its assets to a State bank, and prayed for a receiver to take charge of such assets and for an injunction. We deem it unnecessary to set forth in detail all of the remaining allegations of the petition, and of the amendments by which others were made parties. Demurrers were filed, and to the order overruling them the defendants excepted.

1. Corporations are creatures of the law, and their powers are limited. Every person is presumed to know the law, and is charged with notice of the limitations on the powers of a corporation fixed thereby. The Revised Statutes of the United States, § 5136, give to a national bank the power to "make contracts" and "to exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this title." The provisions referred to do not give power to a national bank to guarantee the payment of the obligations of others solely for their benefit, nor is such power incidental to the transaction of the business of banking. A bank can lend its money, but not its credit. See McGee on Banks & Banking, § 248; 1 Morse on Banks & Banking, §§ 65, 169; 1 Bolles on Law of Banking, § 25; Bolles' National Bank Act Annotated (4th ed.), 40, § 10. A national bank, in negotiating its paper, can bind itself for the payment thereof by its indorsement thereon, but it can not guarantee the payment of the paper of others, or become surety thereon, solely for the benefit of the latter.

2. The plaintiffs, in their petition seeking to recover against the bank on its guaranty of notes, amounting to $15,000, of the Iron Company, given to the plaintiffs, allege, among others, the following facts: The cashier of the bank stated to them that the bank would "readily let said Iron Company have whatever money it needed, but for the fact that the bank had already loaned said Iron Company more money than was authorized by its charter, and the only way it could extend any further credit to said Iron Company was by procuring a loan from petitioners to be secured by said bank," and that if the loan was made, the bank, and its cashier as an individual, would guarantee the payment thereof. The cashier became secretary and treasurer of the Iron Company, and stated to the plaintiffs that he was then in position to make the loan for them of $15,000, and falsely stated that if the loan was made, "the same would be sufficient to pay off all the urgent and pressing debts and would afford the said Southern Car Wheel Iron Company a sufficient working capital for one month's run in advance." The object of the cashier in making statements to defendants in error to induce them to make the loan "was to procure to said bank the payment to it of the said amount so due said bank by said Southern Car Wheel Iron Company, and to release Rowe Price from his liability as cashier in making said excessive loan." It is contended by counsel for the plaintiffs, that, by reason of the facts stated in the petition, and especially by reason of the fact that in pursuance of an understanding between the bank and the Iron Company the bank was paid part of the money loaned by them, the bank is estopped from contending that its guaranty was unauthorized. We can not agree with this contention. It will be observed that the bank did not receive on the debt of the Iron Company all of the money loaned by the defendants in error. In the cases of Peoples Bank v. National Bank, 101 U. S. 181 (25 L. ed. 907), and Talman v. Rochester City Bank, 18 Barb. (N. Y.) 123, the entire amount realized in the transaction went to the bank, in pursuance of an agreement between it and its debtors and the transactions there involved were not illegal. While it is alleged that the money was loaned on the guaranty of the bank, the loan was really made to the Iron Company, and the payment of its notes was guaranteed by the bank. The Revised Statutes of the United States, § 5200, as amended by the act of June 22, 1906 (34 Stat. ch. 3516, p. 451, U. S. Comp. St. Supp. 1909, p. 1331), pro-

hibit a national bank from making to any one person, firm, or corporation, a loan in excess of one tenth of its unimpaired capital stock paid in and its unimpaired surplus. The allegations of the petition, that the cashier told the plaintiffs that the bank had loaned the Iron Company an amount in excess of that prohibited by law, evidently had reference to this law. The petition, therefore, shows that the plaintiffs in error knew, when the loan was made by them, that the bank had loaned the Iron Company an amount exceeding ten per cent. of its unimpaired capital stock and surplus, in violation of the Federal statute above mentioned. It does not appear from the petition that the plaintiffs knew, when the loan was made, that any of the money loaned was to go to the bank. Treating the case on the theory that the loan was made by the plaintiffs to the Iron Company for the sole benefit of the latter, the guaranty would be void under the ruling made in the 1st division of the opinion; and the fact that the bank was a creditor of the Iron Company, and therefore interested in its securing more money and interested in its success, would not make the guaranty valid. Nor would the guaranty be valid because the plaintiffs made the loan to the Iron Company because of the guaranty of the bank. The amount of the loan received by the bank reduced its debt against the Iron Company to that extent, but the bank, by reason of its guaranty, engaged to pay it back to the plaintiffs if the Iron Company did not pay it. Before the loan the bank had the obligation of the Iron Company for this amount. After the loan the bank had this amount paid in cash, but with its obligation outstanding to repay this amount to the plaintiffs if the Iron Company did not. But the bank got only $11,640.02 of the $15,000 loaned, though it guaranteed the payment of the full amount thereof. The balance of something over $3,000 was kept by the Iron Company. Neither in fact nor in theory had the bank reduced the amount it was liable to lose on the Iron Company. The law will not look merely to the form, but will look to the substance of a transaction in determining its legality and effect; and on examining this transaction, we find, taking the allegations of the petition to be true, that while the cashier of the bank, in undertaking to evade the Federal statute prohibiting a loan of over ten per cent. of its capital stock and surplus to the Iron Company, had wiped from its books a showing of indebtedness of the Iron Company to the bank, in practical effect the bank had

attempted to assume liability for a greater indebtedness of the Iron Company than it originally owed the bank. According to the allegations of the petition, the very purpose of the cashier was to obtain a loan from the plaintiffs of $15,000 for the Iron Company on the guaranty of its payment by the bank, in order that a part of the money might be used to pay the debt of the Iron Company, which was an excessive loan in violation of the Federal statute. The plaintiffs knew that part of the $15,000 they loaned was to go to pay some of the pressing debts of the Iron Company and part to defray the expense of operating its plant for a month; and while they did not know that part of the loan was to pay debts due the bank, if they are to take advantage of the fact that part of the money went to pay debts of the Iron Company to the bank, in an action on the contract they will have to let the legality of the matter be governed by all of the facts; and all of the alleged facts show that after the loan and receipt of a part of it by the bank, the latter had a risk on the Iron Company for a greater amount than it had before the loan, and that the cashier, in obtaining the loan, was endeavoring by indirection to circumvent the statute prohibiting a loan of over ten per cent. of its capital stock and surplus to the Iron Company. The loan, by a national bank, of more than ten per cent. of its capital stock and surplus to one customer is an act prohibited by law, whether done directly or indirectly. The transaction in question offended this express prohibition of the law.

It has been ruled in many cases that one who received from a corporation a benefit under a contract involving merely an ultra vires act of a corporation can not defeat the enforcement of the contract, though the commission of ultra vires acts by a corporation subjects it to a forfeiture of its charter by the government. 1 Clark & Marshall on Private Corporations, § 225 (b), p. 600; 1 Bolles on Law of Banking, § 24; 2 Morse on Banks & Banking, § 732. But an ultra vires act of a corporation is not binding upon it, and it can not ratify such an act or be estopped from claiming it to be void, under the decisions of the Supreme Court of the United States. In First National Bank v. American National Bank, 173 Mo. 153 (72 S. W. 1059, 1060), it was said: "The powers of a national bank under the national banking act are essentially matters for Federal construction and interpretation, and, whatever rules may obtain in the several States as to the powers of corporations under State stat-

utes, all State courts must yield to the decisions of the Supreme Court of the United States, construing the powers of national banks under the national banking act." The court then proceeds to show that the Supreme Court of the United States has decided that a national bank has no power to bind itself that a draft drawn on its customer will be paid, and when sued on such a contract it can plead ultra vires, and the fact that the other party to the contract has performed his part of it does not estop the bank from so pleading. The court concludes its opinion in these words: "It will be of no profit in this case to consider the rules of law adopted by the several States bearing upon the power of banks organized by authority other than the Federal government to enter into such contracts, or to interpose the defense of ultra vires after the other party to the contract has fully performed it; for the decisions of the Federal courts treat all such contracts as void and unenforceable as to national banks, and this court is in duty bound to defer to those Federal decisions." See, in this connection, Commercial National Bank *v.* Pirie, 82 Fed. 799. In California Bank *v.* Kennedy, 167 U. S. 362, 368 (17 Sup. Ct. 831, 42 L. ed. 198), the court quotes approvingly from a previous decision of that court the following language: "The doctrine of ultra vires, by which a contract made by a corporation beyond the scope of its corporate powers is unlawful and void and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: The obligation of any one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subject to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law." In De La Vergne Co. *v.* German Savings Institution, 175 U. S. 40, 58 (20 Sup. Ct. 20, 44 L. ed. 65), the court says: "Whatever doubts might have been once entertained as to the power of corporations to set up the defense of ultra vires to defeat a recovery upon an executed contract, the rule is now well settled, at least in this court, that where the action is brought upon the illegal contract, it is a good defense that the corporation was prohibited by statute from entering into such contract, although in an action upon a quantum meruit it may be compelled to respond for the benefit actually received." In 2 Page on Contracts, § 1094, it is said: "If the contract is invalid as against public policy or

forbidden by statute, estoppel has no application." Also, in this connection, see Pullman's Car Co. *v.* Central Transportation Co., 171 U. S. 138 (18 Sup. Ct. 808, 43 L. ed. 108) ; Concord First National Bank *v.* Hawkins, 174 U. S. 364 (19 Sup. Ct. 739, 43 L. ed. 1007) ; Central Transportation Co. *v.* Pullman's Car Co., 139 U. S. 24 (11 Sup. Ct. 478, 35 L. ed. 55) ; McCormick *v.* Market Bank, 165 U. S. 538 (17 Sup. Ct. 433, 41 L. ed. 817) ; Reese on Ultra Vires, §§ 58, 59, 60, 69, 70, 74, 78. In the recent case of Citizens National Bank *v.* Appleton, 216 U. S. 196 (30 Sup. Ct. 364), the facts were in many respects the same as they are in the case we are considering, but the suit there held to be maintainable was construed to be one on an implied contract and not on the express contract of guaranty. Whether the plaintiffs could recover the amount  received by the national bank in a suit other than one on the guaranty is a question not involved, and it need not be considered.

The petition in this case, properly construed, is to recover solely on the guaranty of the national bank. In an amendment the plaintiffs prayed, if it be determined that the guaranty was not legal and binding, that they recover $7,131.02 with which their twelve months time deposit was debited and the account of the Iron Company credited some time before the loan was made, and $400 interest due on the time deposit, which amount of interest they had agreed to release the bank from paying, by reason of certain facts alleged. No recovery of either of these amounts could be had, under all the allegations of the petition and amendments. Mere unauthorized entries on the books of the bank, whereby the time deposit of the plaintiffs was debited with $7,131.02 did not change the existing liability of the bank to them, nor create any new liability as to them. Viewing the transaction from any standpoint, the guaranty of the national bank was one which the bank could not ratify, or estop itself from having declared void; and the petition, for the reasons hereinbefore set forth, was subject to the first and third grounds of the demurrer, which were grounds of general demurrer. Whether the petition was subject to general demurrer for any reason other than the ones we have based our decision on, or to the second, fourth, and fifth grounds of the demurrer, or either of them, is left open without prejudice to any of the parties.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent.*