7586.  ·BANK OF OMEGA v. WINGO, ELLETT & CRUMP
SHOE CO.

1. Neither the cashier nor any official or set of officials of a bank has au-
thority to create a valid obligation whereby it shall guarantee the
payment of the debt of another, or become surety thereon, solely for
the benefit of the debtor.   This is true independently of any question
as to the scope of authority of any such agent; for the reason that
such an attempt on the part of the bank itself would be ultra vires,
illegal, and void.
2. Where a bank, holding for collection a draft with bill of lading at-
tached, notifies the drawer, through its cashier, that it has sufficient
collateral in its possession to pay the draft, and guarantees the pay-
ment thereof by a fixed day, and the bank has authority from the
drawee to make such application, and where, on the faith of the repre-
sentation thus made, the drawer no longer looks to the drawee for the
payment of the obligation, but consents to the delivery of the bill of
lading, and thereafter relies solely upon the bank for payment, such
conduct on the part of the· bank, despite its use of the word "guaran-
tee," constitutes an original undertaking, within the scope of its gen-
eral business, and is enforceable as such.
                             DECIDED JANUARY 23, 1917.

Complaint; from city court of Tifton—Judge Eve.   June 6,
1916.

12

Wingo, Ellett & Crump Shoe Company sued the Bank of Omega, alleging an indebtedness in the principal sum of $360. The ground of complaint, as set out in the petition, is substantially as follows: In October, 1915, Mitcham, who was engaged in the mercantile business in the town of Omega, purchased from the plaintiff, for the sum of $362.20, certain merchandise which was shipped, with the bill of lading attached to a sight draft, drawn through the Bank of Omega. Mitcham failed to pay the draft, and while it, with the bill of lading attached, was being held by the bank, Ragsdale, the bank's duly authorized agent and cashier, wrote a letter to the shippers as follows:

"Bank of Omega. Deposits insured. Omega, Ga.
"Wingo, Ellett & Crump Shoe Co., Richmond, Va.

"Gentlemen: With reference to your invoice to W. C. Mitcham of this place to the amount of approximately $360.00, will say that they offer good security for a loan sufficient to take this up, but, owing to the fact that we are carrying a great deal of cotton at this time, we are not in position to make them the loan, but we are willing to guarantee the payment of this amount by the fifth day of January, 1916. We have the security in our possession, and hereby guarantee the payment of the amount of $360.00 by the fifth day of January, 1916.

"Yours very truly, H. E. Ragsdale, Cashier."

It was alleged that when the bank thereby assumed the said indebtedness, the plaintiff no longer looked to Mitcham for the payment thereof, but authorized the bank to deliver the bill of lading, and thereafter looked solely to the bank on its obligation as an original undertaking. The plaintiff further showed, by its amended petition, that the representations as to the collateral held by the bank, referred to in the letter, pertained to facts peculiarly within the knowledge of the defendant; and that the bank had the right and the express authority from Mitcham to apply the money of the loan on the said collateral to the indebtedness owing the plaintiff.

The defendant filed a general and special demurrer to the petition, contending that the letter of the bank cashier was nothing more than an ultra vires undertaking to guarantee the payment of the account owing by Mitcham, and that the bank could in no wise be held liable thereon, and further contended that even were it an

attempt on the part of the bank, through its cashier, to obligate itself to pay for this merchandise as an original undertaking, the bank could not be bound therefor, because no authority existed on the part of the cashier to bind the bank by such an obligation. The court overruled the demurrers, and it is to this judgment that the plaintiff in error excepts.

R. D. Smith, for plaintiff in error.

J. S. Ridgdill, S. F. Mitchell, contra:

JENKINS, J. (After stating the foregoing facts.) 1. The rule announced in the first headnote is a well-recognized principle, supported by abundant authority in this and other jurisdictions. See First National Bank of Tallapoosa v. Monroe, 135 Ga. 614 (69 S. E. 1123, 32 L. R. A. (N. S.) 550) ; 1 Bolles on Banking, § 25; McGee on Banks and Banking, § 248; Bolles' National Bank Act, Annotated (4th ed.), 40, § 10.

2. Despite the fact that the cashier of the bank, in his letter to the plaintiff, agreed to "guarantee" the payment of the obligation, we think the legal effect of the facts of the case as alleged is to make out an original undertaking on its part, and the use of the word indicated must be treated as merely an inaccuracy of statement, inconsistent with the general purport of the bank's act and intent. A contract of suretyship exists where one pledges his credit for the benefit of another, and it is distinguished from that of guaranty in that in the latter form of obligation the consideration is a benefit flowing to the guarantor. In either of such contracts, however, the person assuming the obligation of another must pledge his credit therefor. The contentions of the petition in this case, fairly construed, show that the bank had agreed to extend a loan to Mitcham in order that the obligation in question might be discharged, and that, in pursuance of that purpose, it had actually taken into its possession and held for its protection as security certain collateral belonging to Mitcham. The only condition of the loan was that the money would not need to be actually furnished until a later date, named in the letter to plaintiff. It is alleged that Mitcham had agreed that the proceeds of the agreed loan should be applied to the payment of plaintiff's debt. Thus, when the bank, by its agreement with the plaintiff, acted on by it, assumed, or, as called by the cashier, "guaranteed," the payment of this obligation and thereby became liable therefor, the securities

of Mitcham in the hands of the bank became subject to the purpose agreed on, and Mitcham himself had then no power to withdraw the same or apply the proceeds of the loan to any other purpose.

Counsel for the plaintiff in error, in his admirable brief and argument before this court, himself makes the statement (which of course is not subject to question) that the cashier might have extended a loan to Mitcham for the purpose of discharging his obligation to the plaintiff. Then, since the allegations of the petition show that such a loan had in effect been made, and the securities therefor actually placed in the hands of the bank, to be held by it for the purpose named, it appears that the promise of the bank was one wherein it simply agreed with the plaintiff, by Mitcham's permission, to apply to the plaintiff's debt the funds of Mitcham so held by it. In so doing it in no wise pledged its own credit, nor in any way became liable for any possible default of him who had been the original debtor. Thus it is that since no pledge of the bank's credit is involved, an essential element of a contract of guaranty is lacking; and as the promise of the bank is founded on a good consideration to the bank by reason of its loan to Mitcham and by reason of the surrender by plaintiff of its bill of lading, we think its promise an original and not a collateral one.

It is contended, however, by the defendant bank that even had its cashier attempted to obligate it to the plaintiff as an original undertaking and not as a guarantor, the same rule of non-liability would apply, because of the want of authority by the cashier to enter into such a contract. It is maintained that such an undertaking on the part of the cashier would be wholly beyond the scope of his authority, and, if so, the principal would not be bound by any such act of its agent. Dismissing now the question of acts which are ultra vires, and therefore illegal for the bank itself to perform, we see no reason why we should hold that the executive officer of a bank could not act for it in arranging a loan to one of its customers, and, by his authority, agreeing with another to pay over to it the proceeds thereof. Indeed, our Supreme Court, in the case of *Bullard* v. *Bank of Madison,* 121 *Ga.* 527 (49 S. E. 615), seems to hold, at least by clear implication, that such an act would be neither illegal on the part of the bank nor unauthorized

on the part of its cashier as the agent thereof. The principle announced in that case is as follows: "A promise by the cashier of a bank, made without consideration to the drawer of a draft, to pay the same out of funds of a customer on whom the draft is drawn and who has been credited with the proceeds of negotiable paper which he as owner transferred to the bank, is not enforceable against the bank, unless the customer assents that the bank shall make such an application of the funds so placed to his credit."

This court is inclined to think that even if the facts alleged in the petition were to be construed so as to set up a contract in the nature of a guaranty on the part of the bank, there would be ground for holding it liable to the plaintiff in the present suit. While it is true that a bank can never be permitted to render itself liable under a contract of suretyship whereby it would seek to pledge its credit for the benefit of another, still, as already indicated, a contract of guaranty differs from that of a surety, in that the consideration in the case of a guaranty is a benefit flowing to the guarantor. And while it should be the settled policy of our courts to scan closely all contracts entered into by a bank, whereby it may seek in any way or for any purpose to become responsible for the obligation of another, still in the case of *First National Bank* v. *Monroe,* supra, the Supreme Court limited its ruling upon the prohibition of a guaranty to those cases in which the bank undertakes to guaranty solely for the benefit of another. Bearing constantly in mind that in the present case the defendant bank in effect holds funds belonging to Mitcham under an agreement with him that they are to be used in extinguishment of the plaintiff's debt, we think that the reasoning of the Supreme Court of the United States in the case of Citizens' Central National Bank of New York v. Appleton, 216 U. S. 196 (54 L. ed. 443), is pertinent to the case at bar. In that case the court spoke as follows: "The plaintiff in error insists that the guaranty given by the Central National Bank to the Cooper Exchange Bank was beyond its power, was in violation of the national banking act, and, therefore, could not be made the foundation of an action against the guarantor bank. But this action need not be regarded as one on the written contract of guaranty, but as based on an implied contract between the Cooper Exchange Bank and the Central National Bank, whereby the latter . . came under a duty to account to

the former for the $10,000 of the $12,000 actually paid to Samuels at its request and on its guaranty. The law would be very impotent to do justice if it could not, under these circumstances, and without violating legal principles, compel the Central National Bank to recognize and discharge that duty. Samuels owed the Central National Bank $10,000, and—with knowledge perhaps of his financial condition—he was put forward by that bank to obtain $12,000 from the Cooper Exchange Bank, so that it could get $10,000 out of that sum, for its own use. The circumstances show that the latter bank would not have loaned the money to Samuels except at the request and on the guaranty of the Central National Bank. . . . In short, the Central National Bank, by means of the device mentioned, got $10,000 of the money of the Cooper Exchange Bank for its own use, and having used it for its own benefit, it now seeks to avoid liability therefor, upon the ground that it was not allowed by the law of its creation to execute the guaranty in question. We know of no adjudged case that stands in the way of relief being granted as asked by the plaintiff. . . . Whatever may be said as to the validity of the written guaranty, now alleged to be illegal, the judgment can be supported as based wholly on the implied contract, which made it the duty of the Central National Bank, under the facts disclosed, to account to the Cooper Exchange Bank for the money obtained from the latter in execution of the agreement made by the former with the borrower."

In the case of Aldrich *v.* Chemical National Bank, 176 U. S. 618 (20 Sup. Ct. 498, 44 L. ed. 611), Mr. Justice Harlan, speaking for the court, said, that "as the money of the Chemical Bank was obtained under a loan negotiated by the vice-president of the Fidelity Bank, who assumed to represent it in the transaction, and, as the Fidelity Bank used the money so obtained in its banking business and for its own benefit, the latter bank, having enjoyed the fruits of the transaction, can not avoid accountability to the New York bank, even if it were true, as contended, that the Fidelity Bank could not, consistently with the law of its creation, have itself borrowed money. . . If the latter bank in this way used the money obtained from the Chemical Bank, it is under obligation to pay it back, or account for it to the New York bank. It can not escape liability on the ground merely that it was not per-

mitted by its character to obtain money from another bank. . . Suppose a national bank, in violation of the act of Congress, takes as security for a loan by it a deed of trust of real estate, and subsequently causes the property to be sold and the proceeds applied in payment of its claim against the borrower, a surplus being left in his hands, which it uses in its business or in discharge of its obligations. If used by the borrower for the amount of such surplus, could the bank successfully resist payment upon the ground that the statute forbade it to make a loan of money on real estate security? Common honesty requires this question to be answered in the negative. But it could not be so answered if it be true that the Fidelity Bank could use in its business and for its benefit money obtained by one of its officers from another bank, under the pretense of a loan, and be discharged from liability therefor upon the ground that it could not itself have borrowed from the other bank the money so obtained and used. There is nothing in the acts of Congress authorizing or permitting a national bank to appropriate and use the money or property of others for its benefit without liability for so doing."

In the case of Central Transportation Co. v. Pullman's Palace Car Co., 139 U. S. 24 (11 Sup. 478, 35 L. ed. 55), the court said: "A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain an action upon the unlawful contract, have always striven to do justice between the parties so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such a case, however, the action is not maintained upon the unlawful contract, nor according to its terms, but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

The ruling of this court in the present case, however, is based upon the principles announced in the headnotes thereof; and, for the reasons therein stated, the judgment of the court below, overruling the demurrer, is

*Affirmed. Broyles, P. J., and Bloodworth, J., concur.*