12409.  BANK OF LUMPKIN *v.* PEOPLES BANK OF ATHENS.

Where a bank, at the request of one of its customers, notifies another bank that it will pay another person's draft upon him with bill of lading attached, and the bank thus notified, acting solely on the faith of this promise, advances to the drawer the money represented by the draft, the bank making the promise is liable to the other bank as on an original undertaking within the scope of its general business, and its status is not that of a mere surety pledging its credit solely for the benefit of the drawee. In such a transaction the drawee's promise to protect the draft is not to be taken as made to the drawer, or to the bank making the advance, but as given to his own bank, which, in consideration of credit thus extended by it to its own customer and in

furtherance of the agreement made by and between them, has agreed directly and alone to repay the advance to be made by the other bank. DECIDED OCTOBER 7, 1921. REHEARING DENIED OCTOBER 24, 1921.

Complaint; from city court of Athens — Judge Bradwell. March 15, 1921.

Application for certiorari was denied by the Supreme Court.

The Bank of Lumpkin sued the Peoples Bank of Athens, alleging, in substance, that the defendant bank was indebted to the plaintiff in the sum of $5,763.16; this indebtedness being based on three drafts drawn by Frank S. Singer on the Creekmore Company, of Athens, Ga., which drafts were to be honored by the Peoples Bank of Athens. The drafts were drawn in accordance with a telegram sent by the Peoples Bank of Athens to the Bank of Lumpkin on February 14, 1918, as follows: " We will honor drafts with bill of lading attached on Creekmore covering 2500 bushels of peas at $3.50 a bushel." In accordance with this telegram the Bank of Lumpkin paid Frank S. Singer for the drafts and sent them to the Peoples Bank of Athens, with the bills of lading attached, and the Peoples Bank of Athens failed and refused to pay the drafts. The Peoples Bank of Athens, before pleading to the merits, filed a demurrer to the petition, the demurrer was overruled, and no exceptions were taken to this judgment. The defendant thereupon amended the demurrer and demurred to the amended petition of the plaintiff, and in the amendment to the demurrer contended that the act of the defendant through its officers, in which the promise was made to honor the drafts on the Creekmore Company as stated, was ultra vires, being an act of suretyship and beyond the authority of the bank. This ground of the demurrer was sustained and the suit dismissed, and the case came to this court on exceptions to this judgment.

*T. T. James, T. J. Shackelford, Shackelford & Meadow,* for plaintiff.

*H. C. Tuck, Lamar C. Rucker,* for defendant.

HILL, J. (After stating the foregoing facts.) The amendment to the demurrer, contending that the act of the defendant bank was ultra vires, was objected to by the plaintiff on the ground that it came too late, as it should have been filed at the appearance term, being in its nature a special demurrer; and an exception was taken to the overruling of this objection. Objection was

also made on the ground that this was a matter for a plea in abatement and not for demurrer. We do not think there is any merit in either of these objections to the filing of the demurrer, as in our opinion the demurrer was in the nature of a general demurrer or a motion to dismiss, and could be filed at any time, and it was proper to make the question by general demurrer and not by plea, as the court would have the right to take judicial cognizance of the charter of the defendant bank filed in the office of the secretary of State. But the view we take of the main question in this case renders immaterial the questions thus made.

The question is whether the promise of the defendant bank, in its telegram to the plaintiff, was an original undertaking within the scope of its general business, or was a pledging of its credit solely for the benefit of the drawee of the drafts, in which event it would be an ultra vires act, and the bank would not be liable. The principle is well established, especially by the decisions of the courts of this State in the cases of *Bank of Omega* v. *Wingo &c. Co.*, 19 *Ga. App.* 177 (91 S. E. 251), and *First National Bank of Tallapoosa* v. *Monroe*, 135 *Ga.* 614 (69 S. E. 1123, 32 L. R. A. (N. S.) 550), that a bank cannot lend its credit to another, cannot become indorser for another, and cannot guarantee the payment of the debt of another solely for the benefit of the debtor. Under the decision in the case of *Bank of Omega* v. *Wingo &c. Co.*, supra, we think it clear that the promise of the Athens bank in the present case constituted an original undertaking and not an act of suretyship. Upon the receipt of the telegram from the Athens bank, agreeing to honor the drafts and pay for the 2,500 bushels of peas at $3.50 a bushel, and relying upon its promise, the Bank of Lumpkin advanced the money and deposited the drafts with the bills of lading attached, and thereby the peas purchased became the property of the Athens bank, possession of which it was entitled to on the payment of the drafts, and thereafter the Bank of Lumpkin relied solely upon the Athens bank for payment. The Athens bank's telegram of acceptance to the Bank of Lumpkin was conditioned only upon two things: that the peas should be paid for at $3.50 per bushel, and that the bills of lading should be attached to the drafts. This was a perfectly legitimate banking transaction. The Bank of Lumpkin had a right to rely upon the promise of the Athens bank. Indeed it had a right to rely upon

the inference that the Athens bank was to pay these drafts out of funds that it had on hand of the Creekmore Company, on which the drafts were drawn. The Bank of Lumpkin had the right to assume that it was a legitimate banking transaction and that the Creekmore Company had funds in the hands of the Athens bank out of which to pay these drafts. The transaction, tersely stated, is as follows: Singer, at Lumpkin, had peas to sell. Creekmore Company, a customer of the Peoples Bank of Athens, desired to buy these peas. These parties had to use the banks to carry out this commercial transaction. If the Peoples Bank had been at Lumpkin and had desired to furnish the money to the Creekmore Company to buy these peas, the bank could have taken the bills of lading in its name and given the purchase-money over to the Creekmore Company, or to Singer, and if such had been the case it would not have been said that the bank in advancing the money was acting outside of its charter. But the Peoples Bank was not at Lumpkin and could not pay over the money to Singer for the peas for the account of its customer, the Creekmore Company; therefore the Peoples Bank used the wire and the services of the Bank of Lumpkin. It wired the Bank of Lumpkin to pay for the peas, 2,500 bushels, at $3.50 a bushel, and to draw the drafts on the Creekmore Company for the amount, with the bills of lading attached.

In our opinion this was an original undertaking in which it was agreed, in effect, to pay back the money to the Bank of Lumpkin if the Bank of Lumpkin advanced it under the instructions of the Peoples Bank; and the Bank of Lumpkin carried out the instructions given it by the Peoples Bank to the very letter and paid for the peas at $3.50 a bushel, 2,500 bushels, and drew the drafts on the Creekmore Company through the Peoples Bank, with the bills of lading attached. The transaction between the two banks was a usual and ordinary banking transaction. If such transactions were ultra vires, banks would be crippled and commercial transactions greatly delayed and hindered. We therefore conclude that the learned trial judge erred in sustaining the demurrer to the petition on the ground covered by the amended demurrer, to the effect that the act of the Athens bank was ultra vires, and for that reason not enforceable.

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*