GARDINER TRUST COMPANY *vs.* AUGUSTA TRUST COMPANY.

R. P. HAZZARD COMPANY AND NORMAN H. TRAFTON,

INTERVENORS AS PARTIES PLAINTIFF.

Kennebec.       Opinion, March 6, 1936.

*Lee M. Friedman,*
*Will C. Atkins,*
*Carlton W. Spencer,*
*Friedman, Atherton, King & Turner,* for plaintiff.
*John E. Nelson,*
*James B. Perkins,* for defendants.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MANSER, JJ.

THAXTER, J.  This case involves a controversy between the receivers of two closed banks, the Gardiner Trust Company and the Augusta Trust Company, formerly known as the Augusta Safe Deposit and Trust Company. It has been brought before the court by a bill in equity filed by the conservator, now the receiver of the Gardiner Trust Company, who seeks to subordinate in favor of the depositors of his bank a claim of the Augusta Trust Company of $236,500, represented by certificates of deposit of the Gardiner Trust Company. The plaintiff bank claims that there was a guaranty of its deposits by the defendant, and asks that it be permitted to apply the deposit of the defendant in so far as necessary to satisfy in full the claims of its own depositors. Norman H. Trafton and R. P. Hazzard Company, depositors in the Gardiner Trust Company, were granted leave to intervene. Several amendments to the bill were allowed; a demurrer to the amended bill was overruled; and an exception was taken by the defendant. The court then proceeded to a hearing, during the course of which a number of exceptions were noted to rulings of the sitting Justice, who finally entered a decree sustaining the bill and directing that the defendant's deposit be applied in so far as might be necessary to pay in full the

depositors of the plaintiff bank. From this decree an appeal was entered by the receivers of the Augusta Trust Company. It is unnecessary in this opinion to consider the exceptions, for the fundamental issue is raised by the appeal.

The two banks were located in near-by cities, the Augusta Trust Company being much the larger. In the fall of 1930, the Gardiner Trust Company was in financial difficulties. An audit made on October 16, 1930 showed that its capital, surplus, and undivided profits had been wiped out and that it would be unable to meet the demands of its depositors and other creditors in an amount of at least $60,000. Its deposits at this time were approximately $760,000 and its other indebtedness about $190,000 more. Hurried conferences were held, and on October 21, 1930, the R. P. Hazzard Company, a large depositor in the bank, and the Augusta Trust Company entered into a contract under the terms of which it was provided that, conditional upon not less than nine hundred shares of the total capital stock of one thousand shares of the Gardiner Trust Company being transferred to the Augusta Trust Company not later than October 25th following, all the officers and directors of the Gardiner Trust Company were to resign; all stockholders so transferring shares to the Augusta Trust Company were to be relieved of statutory liability for assessment by reason of stock ownership; the Augusta Trust Company would pay an assessment of $53.00 per share to the Gardiner Trust Company on the shares acquired; "in consideration of the foregoing agreements on the part of said Augusta Trust Company and the deposit of said shares by said stockholders the said R. P. Hazzard Company agrees that it will, to the extent of $28,000, and no more, assist the Augusta Trust Company in caring for the liabilities of said Gardiner Trust Company and to make it possible for all depositors in said Gardiner Trust Company to draw on their accounts."

Pursuant to this agreement 967 shares of the capital stock were transferred into the name of the Augusta Trust Company, or its nominees. The officers and directors of the Gardiner Trust Company resigned, and the vacancies were filled by the Augusta Trust Company electing its nominees, several of whom were its own officials. Its own treasurer became president. The Augusta Trust Company paid to the Gardiner Trust Company the assessment of

$53 per share on the stock which it had taken over, and R. P. Hazzard Company, in accordance with the contract, paid to the Augusta Trust Company the sum of $28,000. On October 25, 1930 the Augusta Trust Company caused the following advertisement to be inserted in the *Kennebec Journal*, a newspaper which had a large circulation in and around Gardiner:

## ANNOUNCEMENT

### AUGUSTA TRUST CO.

has taken over control and management of

### GARDINER TRUST CO.

and is fully responsible for both its checking
and savings deposits.

#### AUGUSTA TRUST COMPANY

Hiram L. Pishon, *Pres.*
Milton S. Kimball, *Treas.*

A similar pronouncement was posted in the banking rooms of the Gardiner Trust Company and displayed in its windows.

Depositors, however, continued to demand their money, and these withdrawals were met by loans of credit and by advances from the Augusta Trust Company, both of which finally took form in the obligation of $236,500 which is in issue in this case. The Gardiner Trust Company closed its doors June 28, 1933, and the Augusta Trust Company followed with similar action five days later.

The sitting Justice found that the acts of the Augusta Trust Company constituted a standing offer to each and every depositor, who continued his deposit in the Gardiner Trust Company, or made a new one, to be responsible that the same would be repaid, and that this offer ripened into a contract with each and every depositor as he accepted it by continuing his deposit or by making a new one. He also ruled that, irrespective of the application of the law of contracts, the principle of estoppel held the Augusta Trust Company to a guaranty of the deposits of the Gardiner Trust Company.

By the defendant's appeal three issues are now presented to this court: first, was the contract entered into by the Augusta Trust Company properly construed as a guaranty of the deposits of the Gardiner Trust Company; second, if so, did the Augusta Trust Company have power to make such a contract; third, if it was without such power, does an estoppel prevent it from now asserting its want of authority. These questions will be considered in their order.

*Was the contract of October 16, 1930 intended as a guaranty of the deposits of the Gardiner Trust Company?*

Nothing is said specifically about a guaranty, but one was clearly intended. The manifest purpose of the whole scheme was to keep the Gardiner Trust Company open by giving assurance to its depositors that their claims would be met in full. There would have been no point at all to the plan, if it had not been the intention of the Augusta Trust Company to stand as sponsor for the other bank. The shares of stock were certainly not taken over as an investment. It was an arrangement devised during conditions of storm and stress to prevent the closing of a bank with resultant repercussions on other banks and evil effects on the community in general. The so-called advertisement is compelling evidence that the officials of the Augusta Trust Company regarded the agreement as a guaranty, and for a period of nearly three years they supplied from their bank the necessary cash to meet all withdrawals from the other. The finding of the sitting Justice that the arrangement entered into by the Augusta Trust Company was intended to be a guaranty of the deposits of the Gardiner Trust Company seems fully justified.

*Did the Augusta Trust Company have the power to make such a guaranty?*

The Augusta Trust Company was incorporated in 1893 by special legislative act. Priv. & Special Laws 1893, Chap. 410, as amended by Priv. & Special Laws 1899, Chap. 138. The powers granted to it are contained in the first three sections of the enactment as amended, which read as follows:

"Sect. 1. J. Manchester Haynes, Orville D. Baker, George E. Macomber, J. F. Hill, Ira H. Randall, H. R. Sturgis, C. H.

White, or such of them as may by vote accept this charter, with their associates, successors and assigns, are hereby made a body corporate and politic, to be known as the Augusta Safe Deposit and Trust Company, and as such shall be possessed of all the powers, privileges and immunities, and subject to all the duties and obligations conferred on corporations by law, except as otherwise provided herein.

"Sect. 2. The corporation hereby created shall be located at Augusta, Kennebec County, Maine.

"Sect. 3. The purposes of said corporation and the business which it may perform, are: first, to receive on deposit, money, coin, bank notes, evidences of debt, accounts of individuals, companies, corporations, municipalities and states, allowing interest thereon, if agreed, or as the by-laws of said corporation may provide; second, to borrow money, to loan money on credits or real estate or personal security, and to negotiate loans and sales for others, to guarantee the payment of the principal and interest of all obligations secured by mortgages of real estate running to said Augusta Safe Deposit and Trust Company, to issue its own bonds or obligations based upon real or personal property conveyed to it in trust, to secure the payment of such bonds or obligations and the interest thereon; third, to hold for safe-keeping all kinds of personal or mixed property, and to act as agents for the owners thereof, and of real estate for the collection of income on the same, and for the sale of the same, and to act as agent for issuing, registering and countersigning certificates, bonds, stocks and all evidences of debt or ownership in property; fourth, to hold by grant, assignment, transfer, devise or bequest any real or personal property or trusts duly created, and to execute trusts of every description; fifth, to act as assignee, receiver, executor, and no surety shall be necessary upon the bond of the corporation, unless the court or officer approving such bond shall require it; sixth, to hold and enjoy all such estates, real, personal and mixed, as may be obtained by the investment of its capital stock or any other moneys and funds that may come into its possession in the course of its business and dealings,

and the same sell, grant, mortgage and dispose of except as provided in section ten; seventh, to do in general all the business that may lawfully be done by a trust or banking company; eighth, to erect, construct, own, maintain and operate safety deposit and storage vaults for the safe-keeping of valuables, and to rent and hire boxes, safes and space in the same, to purchase, lease, acquire, hold, sell, and dispose of real estate and all other property, and to do all and every act incident to said business, and to guarantee titles to real estates, and the legality and regularity of corporate stocks and bonds."

It is obvious that nowhere is express authority given to the corporation to lend its credit to another bank or to guarantee any deposits therein. It may "guarantee the payments of the principal and interest of all obligations secured by mortgages of real estate" running to it, and it may "guarantee titles to real estates, and the legality and regularity of corporate stocks and bonds." Beyond that nothing is said. Counsel for the plaintiff contend in their brief that the first section of the charter, which provides that the corporation "shall be possessed of all the powers, privileges and immunities, and subject to all the duties and obligations conferred on corporations by law, except as otherwise provided herein," gives to this bank general powers in addition to those enumerated in section 3. If this claim were sound, there would seem to be no need of setting forth the specific powers in section 3. Nor does the final clause of section 3, which grants to it authority "to do all and every act incident to said business," extend its authority into any new field.

The truth of the matter is that in determining what implied authority a corporation may have we are met at the threshold with the general principle that an enumeration of specific powers excludes all others except such as are reasonable and necessary to carry into effect those expressly given. *Hyams* v. *Old Dominion Company*, 113 Me., 294, 93 A., 747; *Franklin Company* v. *Lewiston Institution for Savings*, 68 Me., 43; *Davis* v. *Old Colony Railroad Company*, 131 Mass., 258; *De La Vergne Refrigerating Machine Company* v. *German Savings Institution*, 175 U. S., 40;

*Thomas* v. *West Jersey Railroad Company*, 101 U. S., 71 ; Fletcher, Cyclopedia Corporations (Per. Ed.), Vol. 6, Page 372.

Such is the rule with respect to corporations generally. But, in the case of a bank, which is in a sense a public institution, which holds itself out as qualified to care for the money of others, it is more than ever important that its charter should be strictly construed, and that those members of the public who entrust their property to its care should have assurance that it will act only within those limits which the legislature has defined. *County of Divide* v. *Baird*, 55 N. D., 45, 212 N. W., 236. See also the general discussion of the relations between a bank and its depositors in *Craughwell* v. *Mousam River Trust Company*, 113 Me., 531, 534, 95 A., 221.

Because of the direct interest in a bank of all those who may become depositors in it and the vital concern of the general public in its proper management, the state has interposed its authority in order to define its power, to supervise its management, and in case of trouble to take over and distribute its assets. As we consider the intent back of all this restrictive legislation, we can not escape the conclusion that the plaintiff's contention with respect to the powers of the Augusta Trust Company is opposed to the general purposes which the legislature has had in mind in its enactments concerning banks.

The bank commissioner of the state is required by statute to examine every bank, to determine whether it is able at all times to meet its obligations, and he must publish a statement of its condition. Every bank is required to keep a cash reserve of at least fifteen per cent of its demand deposits. The amount which it may loan is restricted to a certain percentage of its capital, unimpaired surplus, and net undivided profits. The capital stock of a bank must be kept unimpaired, and assessments are provided for, when it appears insufficient in amount to secure adequately the claims of depositors.

Of what use is an examination of a bank if the succeeding day it may incur an obligation to the depositors of another institution of undetermined amount? The very publication of a bank statement, which clearly would not show such contingent liability, would be

but a sham, the effect of which would be to deceive rather than to make known to the general public its condition. No information at all is better than misinformation. How are the depositors protected by the maintenance of a cash reserve, if overnight a bank may, without any addition to its own assets, assume the liabilities of one or more other banks? Is there any reason in restricting the amount which a bank may loan, and at the same time permitting it to assume an unrestricted liability as a guarantor? Of what efficacy is it to require the maintenance of a capital and reserve to protect its own depositors, if it is to be allowed indiscriminately to assume obligations to the depositors of other institutions?

A mere casual consideration of these questions would compel us to conclude that the contract here in question, not only is opposed to fundamental principles of sound banking, but violates the spirit of those statutes designed to safeguard the money of the depositors in our banks. It is against public policy and void. Making all due allowances for the stress under which the arrangement was made, it is hard to understand how it could have been viewed in any other light. Be that as it may, to refuse to condemn it today would be proof that we have learned nothing from the tragedies of the last few years.

A review of the authorities leaves no doubt as to the general opinion on this question.

Except to protect an investment of its own, or as an incident to the transfer of commercial paper, or to effectuate a merger with another institution, a bank has no implied power to become a guarantor, and any contract by which it seeks to do so is void. *In re Bankers Trust Co.*, 27 F. (2 ed.), 912; *Ward* v. *Joslin*, 186 U. S., 142; *Dewey Column & Monumental Works* v. *Ryan*, 206 Ia., 1100, 221 N. W., 800; *Norton* v. *Derry National Bank*, 61 N. H., 589; *Cottondale State Bank* v. *Oskamp Nolting Co.*, 64 Fla., 36; *First National Bank of Tallapoosa* v. *Monroe*, 135 Ga., 614, 69 S. E., 1123; Morse on Banks & Banking (6 ed.), Sec. 65; Michie on Banks and Banking (Per. Ed.), Sec. 44. See also *Ellis* v. *Citizens' National Bank of Portales*, 25 N. M., 319, 323, 183 P., 34. Nor can an ultra vires contract be held valid because of the supposed indirect benefits that may accrue from its performance. *In re Bank-*

*ers Trust Co.*, Supra; *Davis* v. *Old Colony Railroad,* supra.

In support of their contention counsel for the plaintiff have cited numerous cases, which are not, however, in conflict with the principles here enunciated.

It is claimed that *Batchelder & Snyder Company* v. *Saco Savings Bank,* 108 Me., 89, 79 A., 13, is an authority in point. This case holds that a bank lawfully owning a summer hotel may guarantee the performance of a contract for its operation in order to protect its investment therein. From this counsel argue that the Augusta Trust Company may guarantee the deposits of the Gardiner Trust Company, in order to safeguard the purchase which it has made of the capital stock. But the two cases are entirely different. The Saco Savings Bank was permitted to enter into such a contract to protect an investment which it had already made. Such power was a mere incident of its right to protect and hold that property. In the case before us, the purchase of the stock and the guaranty were parts of one transaction. It is specious to claim that the guaranty was to protect a lawful investment in the stock. The stock was worthless when bought. The giving of the guaranty was the main purpose of the whole scheme, and the holding of the stock merely incidental. There is likewise a very wide difference between a guaranty of the deposits of another bank, a liability which may expand indefinitely, and assuming a responsibility, the extent of which is fixed. Similar cases are cited by counsel, a discussion of which is unnecessary.

It is important to remember that this is not a case of one bank taking over the assets and assuming the liabilities of another. Such an arrangement, when carried through on reasonable terms, has been held proper. *Hightower* v. *American National Bank of Macon,* 263 U. S., 351. The distinguishing characteristics of such a scheme are that there is a consideration in the transfer of tangible property for the assumption of the obligation and that the extent of the liability is fixed when the agreement is made.

Counsel contend, rather feebly to be sure, that only the state can raise the defense of ultra vires. In some special cases this may be true. *Farrington* v. *Putnam,* 90 Me., 405, 37 A., 652. *Oakland Electric Company* v. *Union Gas and Electric Company,* 107 Me.,

279, 78 A., 288. The rule is, however, otherwise in the ordinary case, and there can be no possible doubt of the right of a corporation to invoke such defense against the enforcement of a contract foreign to the purposes of its charter. Such a contract is void. *Brunswick Gas Light Company* v. *United Gas, Fuel and Light Company*, 85 Me., 532, 27 A., 525.

*Is the Augusta Trust Company estopped from claiming that this contract is void?*

We are in accord with the views expressed by plaintiff's counsel on the general question of estoppel. It is, however, important to bear in mind that the problem may be a very different one in the case of a natural person, whose power to act is limited only by the prohibitions of the common or statute law, and of a corporation which derives its authority solely from the statutes under which it has been created. If a corporation is without power to bind itself by an express contract, it is difficult to see how it can do so by a representation acted on by a third party. In fact, the doctrine of estoppel has a very limited scope, when applied to the ultra vires acts of corporations. We are not concerned with those cases where a recovery of benefits received under an ultra vires contract has been permitted on a *quantum meruit, Brunswick Gas Light Company* v. *United Gas, Fuel and Light Company*, supra, nor with those which involve the enforcement by the innocent holders of notes of an endorsement by a corporation which was in fact made for accommodation. *Johnson* v. *Johnson Brothers*, 108 Me., 272, 80 A., 741. The Augusta Trust Company received from this contract no benefit which it is inequitably retaining for itself, nor is this a case which relates to the law governing commercial paper. Broadly speaking, the issue is whether a contract, patently beyond the powers of a corporation and clearly against public policy, can be enforced because of an estoppel. In other words, can the corporation by its representations to third persons do that which the law has in effect forbidden? There can be but one answer.

In *Franklin Company* v. *Lewiston Institution for Savings*, 68 Me., 43, the defendant bank subscribed $50,000 for stock in the Continental Mills. The bank was not in a position to make immediate payment, which was taken care of for it by the plaintiff

which took notes of the bank secured by the stock as collateral. A claim was presented to the receiver of the bank, which was rejected by commissioners. In affirming such ruling, the opinion holds that the acts of the bank were ultra vires, unlawful and void. The claim that there could be an estoppel would seem to be effectually disposed of by the following language of the court, page 45: "As corporations are created by public acts of the legislature, and all their powers, duties and obligations are declared and clearly defined by public law, parties dealing with them must take notice of those powers and the limitations upon them, at their peril; and will not be allowed to plead ignorance of those powers and limitations in avoidance of the defense of ultra vires."

In the case of *Pittsburg, Cincinnati and St. Louis Railway Company* v. *The Keokuk and Hamilton Bridge Company*, 131 U. S., 371, cited with approval in *Brunswick Gas Light Company* v. *United Gas, Fuel and Light Company*, supra, Justice Gray, at page 389, lays down the rule that no estoppel arises to deny the validity of an ultra vires and unlawful contract merely because it has been executed, but that the remedy of the aggrieved party is to disaffirm it and to recover on a *quantum meruit* the value of what the defendant has actually received the benefit of.

This same question has recently been before the United States Supreme Court. In *Texas & Pacific Railway Company* v. *Pottorff*, 291 U. S., 245, the question was as to the right of a bank to pledge a part of its assets to secure a private deposit. The court in its opinion holds that such a power is, not only not given to a national bank in its charter, but to permit the exercise of it, is opposed to good banking practice and inconsistent with many provisions of the National Bank Act. Justice Brandeis, speaking for the court, page 260, disposes of the claim that there was an estoppel in these words: "It is the settled doctrine of this Court that no rights arise on an ultra vires contract, even though the contract has been performed; and that this conclusion cannot be circumvented by erecting an estoppel which would prevent challenging the legality of a power exercised."

Exactly the same question was raised in *County of Divide* v. *Baird*, supra. With reference to estoppel, the court said, page 61:

"As between the creditors and depositors of an insolvent bank, whose contractual relation with the corporation was created lawfully—intra vires—and the plaintiff, whose contract of pledge was ultra vires of the bank and unlawful, the former must be preferred, and the rule is that they are not estopped to assert the want of power."

See also to the effect that no estoppel arises to plead that a contract is ultra vires and unlawful, *Smith* v. *Baltimore & O. R. Co.,* 48 F. (2d), 861, and cases therein cited; *Ward* v. *Joslin,* supra; *Commercial Casualty Insurance Company* v. *Daniel Russell Boiler Works, Incorporated,* 258 Mass., 453, 155 N. E., 422; *First National Bank of Tallapoosa* v. *Monroe,* supra; *Globe Indemnity Co.* v. *McCullom,* 313 Pa., 135, 169 A., 76; *Western Maryland Railroad Company* v. *Blue Ridge Hotel Company,* 102 Md., 307, 62 A., 351; *Ellis* v. *Citizens' National Bank of Portales,* supra, page 323; *In re Bankers Trust Co.,* supra.

The bill in equity in the present case in effect asks that the receiver of the Gardiner Trust Company be instructed as to his right to hold the deposit of the Augusta Trust Company. He is clearly withholding it without right, for the contract under which he claims a lien on it for the benefit of the depositors of his bank is against public policy, unlawful and void. He should be directed to pay to the Augusta Trust Company such dividend as it is entitled to receive. The appeal is sustained and the case remanded for a decree in accordance with this opinion.

*So ordered.*