## Commonwealth *v.* Philadelphia Saving Fund Society, Appellant.

Argued May 23, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Charles J. Biddle,* of *Drinker, Biddle & Reath,* with him *Snyder, Hull, Leiby & Metzger,* for appellant.

*Frank A. Sinon,* Deputy Attorney General, with him *Claude T. Reno,* Attorney General, for appellee.

OPINION BY MR. JUSTICE SCHAFFER, June 19, 1939:

The matter before us on this appeal by The Philadelphia Saving Fund Society is whether it may deduct from gross income certain losses which it sustained, in order to arrive at the "net earnings or income" made liable to a state tax of three per cent, under Section 27 of the Act of June 1, 1889, P. L. 420, as amended by the Act of April 25, 1929, P. L. 668, 72 PS Sec. 2241. The court below decided the losses were not deductible, and entered judgment against appellant for $86,296.31,

The section of the act reads as follows: "From and after the passage of this act every incorporated company or limited partnership whatever, whether the same be incorporated, formed or organized under the laws of this or any other State or Territory, and doing business within this Commonwealth, and liable to taxation therein, which is not subject to the taxes imposed by the twenty-first or twenty-fourth sections of this act, except incorporated banks and savings institutions having capital stock, and foreign insurance companies, shall annually, upon the fifteenth day of March of each year, make report to the Department of Revenue setting forth the entire amount of net earnings or income received by said company or limited partnership from all sources during the preceding year, and such other information as the Department may require; and upon such net earnings or income, the said company, association or limited partnership, as the case may be, shall pay into the State Treasury, through the Department of Revenue, for the use of the Commonwealth, within the time prescribed by law for the payment of State taxes settled by the Department of Revenue, three per centum upon such annual net earnings or income, in addition to any taxes on personal property to which it may be subject under the first section of this act. The penalty for failure to make such report shall be as provided by law: Provided, That this section shall not apply to corporations and limited partnerships chartered or organized for manufacturing purposes."

The essential facts are these: During the banking crisis in 1931, when "runs" were taking place on the banking institutions in Philadelphia, the four mutual saving fund societies therein, other than the First Penny Savings Bank, were subjected to withdrawals in the month of October amounting to $34,000,000 more than they had received. Prior to that time, the First Penny had been subjected to large withdrawals. It had almost 100,000 depositors, many of whom had accounts in the

other savings banks. The four other mutual savings institutions in the city decided, after investigating the First Penny, that it was in danger of failing. If its doors were closed, there was grave danger that a panic would result among the depositors in the other savings banks, and that the others would suffer great losses from a compulsory sale of securities in order to meet depositors' demands. It was decided that the four other institutions would take over the First Penny and assume its deposits, irrespective of whether its assets were sufficient in value to accomplish the desired result. They did not guarantee anything or operate the First Penny. They took it over, closed it, assumed its liabilities and liquidated it. This purpose was affected by an agreement under which all of the assets of the First Penny were transferred to the Western Saving Fund Society, as liquidating trustee for the institutions concerned, which agreed to assume all the deposit and other liabilities of the First Penny, the resulting losses, if any, to be shared in proportion to the total assets of each of the four, the percentages being, for the Philadelphia Saving Fund Society 69.4%, Western Saving Fund Society 15.7%, Beneficial Saving Fund Society 8.6% and Saving Fund Society of Germantown 6.3%. The plan was approved by the Secretary of Banking. The result of the carrying out of the plan was a loss to the four institutions in excess of $3,500,000. Appellant's share of this was almost $2,500,000. It paid in cash to the Western at the end of 1934 in liquidation of this loss $2,493,536.30.

That which is taxable under the act is the "annual net earnings or income" of appellant. The court below determined that in arriving at annual net earnings or income, the deductions claimed were not allowable, basing its conclusion upon three cases decided by us, in which under prior acts "net earnings or income" had to be determined: *Com. v. Ocean Oil Co.,* 59 Pa. 61; *Com. v. Penn Gas Coal Co.,* 62 Pa. 241; *Philadelphia*

*Contributionship for Insurance v. Com.*, 98 Pa. 48. These cases are not controlling of the present controversy. In the Ocean Oil case, we decided that the depletion of the capital of the oil company by the production of oil could not be charged as an expense of operation, that it was a capital loss, particularly in view of the fact that the company had paid dividends to its stockholders, without taking account of the depletion of its oil reserves as an operating cost. In the Penn Gas Coal case, the rule of the Ocean Oil case was applied by denying the right to deduct capital depletion by coal mined, from gross income, and in the Contributionship case, we refused the right to deduct the premium paid on government bonds when they were purchased, as an allowance against gross income in the year when they were called at par. In that case, it was said (p. 50): "the premiums paid for the bonds *should* have been deducted when the investment was made, and might properly have been accounted for and taken from the gross receipts." None of the situations in these cases bears an analogy to what is now before us. The court below took the view, as does the Commonwealth, that the loss was a capital one and not an earning or income loss. Passing the question whether or not mutual savings banks, which have no capital stock, have assets which can be considered in two aspects, one of them as capital and the other not, we think it obvious that the loss sustained was a loss of earnings and income, just as it would be clear that if a profit had been made, the profit would have been one of earnings or income.

It is obvious that the four institutions did not take over the First Penny as a capital asset. All of the assets were taken over by the four for the purpose of saving themselves from possible disaster. We are unable to see any difference between what was actually done, and the situation which would have existed, if the four institutions, which are mutual concerns with-

out capital stock, had purchased the assets of the First Penny and sold them at a loss. It is not conceivable that, if they had come out of the transaction with a profit, such gain would not have been treated by the Commonwealth as part of income; the mere fact that a loss was sustained does not alter the situation. No question can arise that the loss was made because it was paid in cash during the year in which the deduction is claimed. Appellant received nothing for the payment which it made. It was entirely out of pocket. Paid exclusively in performance of an agreement of indemnity, it, therefore, cannot be a capital loss.

It is the contention of the Commonwealth that the permissible deductions from gross earnings "are limited to current business expenses," and it argues that the losses are not deductible, because not business expenses. We think, however, that the losses to be taken into account are not limited to ordinary business expenses. Certainly if the institution had invested the funds of its savings depositors in those securities in which it is authorized to invest and had sold the securities at a loss, such loss would be deductible. What was said in the Ocean Oil Company case about "after deducting expenses only" was properly applied there, where the business of producing and selling oil was being carried on. With mutual savings societies, the business carried on is receiving savings money from their depositors, investing that money in certain types of securities, holding them and collecting the interest or dividends thereon, waiting for their maturity or selling them at a profit or loss, and, out of the total realized, paying operating expenses and losses, interest to the depositors and repaying the deposits. In the event of liquidation the assets would go to the depositors. There is no capital in the sense that capital exists in corporations which have paid in capital represented by stock. The only thing which could be assimilated to capital is the surplus or reserve, which in reality is the accumulation

of money which would otherwise go to depositors and is held for their protection.

The income tax cases and others, in which allowable deductions are set forth in the statute levying the tax, are by no means precedents in the problem we are considering, because the statute before us does not enumerate allowable deductions or define net earnings or income.

It is also contended by the Commonwealth that the losses are not deductible in the year 1934, because they were neither sufficiently ascertained nor entirely sustained in that year. We think the position assumed untenable. In that year the entire transaction was closed. Before that it could not be ascertained just what the losses were. At that time some of the assets received by the Western had not been sold. They were appraised, on an appraisement admittedly fair, and taken over and paid for by each institution, in certain proportions. Each of them made, in addition, the necessary payments to the Western to cover its agreed share of the difference between the appraised value of the assets and the liabilities of the First Penny. This was a definite and final liquidation, determinative of liability under the liquidation agreement. When the appellant paid the loss so determined and received a release from further liability, its loss was then sustained. The Commonwealth apparently recognized what was done, because, since that time, when any of the assets of the First Penny were sold by the institutions, at a profit above the appraisement, taxes were paid the Commonwealth on this profit as part of net income. When any of these assets are sold at a profit in the future, it is agreed that they will be subject to the payment of the tax.

Although not insisted upon by the Commonwealth, it is questioned in the opinion of the court below, whether the action of the four institutions in taking over the First Penny was not an ultra vires act. We con-

clude that what was done was not ultra vires. The banks did not guarantee anything. They took over the assets of the other institution and liquidated it, for self-preservation. The court below in its consideration of this question refers to the case of *Gardiner Trust Co. v. Augusta Trust Co.*, 134 Me. 191, 182 A. 685. The court took pains to point out that the situation before it was (p. 690) "not a case of one bank taking over the assets and assuming the liabilities of another. Such an arrangement, when carried through on reasonable terms, has been held proper: *Hightower v. American Natl. Bank of Macon*, 263 U. S. 351, 44 S. Ct. 123, 68 L. Ed. 334." In *O'Connor v. Bankers Trust Co.*, 289 N. Y. S. 252, 159 Misc. 920 (affirmed 253 App. Div. 714, 1 N. Y. S. (2) 641, and by the Court of Appeals, 278 N. Y. 649, 16 N. E. (2) 302), where a similar arrangement with respect to the taking over of one bank by others was being reviewed, it was said (pp. 271, 272) : "The right of self-preservation applies to banks as well as to business corporations and individuals generally. . . . Where those charged with the management of a bank act in good faith and deliberately, with an eye to its own interests and welfare, the exercise of the power here invoked will be upheld. . . . If, in such a situation, action to prevent the failure of a member bank is taken by other member banks in the exercise of fair and honest judgment at the time, for the purpose of preserving the security and integrity of their own institutions, such action, within reasonable limitations, is not an invalid exercise of corporate power." See also *Fetzer v. State Bank of Forestville*, 229 Wis. 452, 282 N. W. 639; *Southern Exchange Bank v. First Natl. Bank of Dublin*, 37 Ga. App. 612, 141 S. E. 323; *Andrew v. The People's Saving Bank of Des Moines*, 216 Ia. 252, 249 N. W. 352; *Trust Co. of New Jersey v. Jefferson Trust Co.*, 15 N. J. Misc. 656, 186 A. 732. In the latter case, the facts are almost identical with those before us.

Judgment reversed and here entered for defendant.